## AFFIDAVIT

I, Jamie Frates, a Task Force officer ("TFO") with the Federal Bureau of Investigation ("FBI"), Kansas City, Missouri, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. At all times throughout this affidavit, I use the terms "child sexual abuse material ("CSAM")" or "child pornography" merely as shorthand to refer to visual depictions of actual minors engaged in sexually explicit conduct. I use the terms "visual depiction," "minor," and "sexually explicit conduct" as those terms are defined in 18 U.S.C. § 2256.

2.  I am currently employed as a detective with the Kansas City, Missouri Police Department and am serving as a TFO with the FBI. I have been employed with the Kansas City, Missouri Police Department since July 2003, and am currently assigned to the FBI Child Exploitation Task Force, Kansas City, Missouri. Since February 2022, I have been assigned to investigate computer crimes to include violations against children. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations. These trainings have included instruction related to the laws against sexual abuse of minors, online applications used to entice children to produce sexually explicit material or engage in sexually explicit conduct with adults, and other subjects related to offenses committed against minor children. I have assisted in the investigation of over 50 child pornography cases. During that time, I have had to view thousands of images of child pornography. I have previously applied the federal definition of child pornography used in this affidavit to multiple search warrant applications and a grand jury presentation.

3. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence and curtilage located at **16111 Slater Ave., Belton, Missouri 64012** (hereinafter the "**SUBJECT PREMISES**"), which is more particularly described in **Attachment A,** for the items specified in **Attachment B.** I submit there is probable cause to believe that violations of 18 U.S.C. §§ 2252(a)(2) and (a)(4), that is receipt, distribution and possession of child pornography, have occurred at the **SUBJECT PREMISES,** and that the evidence, fruits, contraband and instrumentalities of those violations are located at the **SUBJECT PREMISES**.

4. The statements contained in this affidavit are based in part on information provided by law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training and background as a TFO with the FBI. Since this affidavit is being submitted for the limited purpose of showing that there is probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

## STATUTORY AUTHORITY

5. This investigation concerns alleged violations of 18 U.S.C. § Section 2252(a), relating to material involving the sexual exploitation of minors. 18 U.S.C. § 2252(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually explicit conduct

when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce.

6. 18 U.S.C. § 2252(a)(2) prohibits a person from knowingly receiving or distributing any visual depiction of minors engaging in sexually explicit conduct in interstate or foreign commerce, by computer or mail. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to possess one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

## PROBABLE CAUSE

7. On March 16, 2023, Affiant was conducting an online investigation on the BitTorrent network for offenders sharing CSAM. Affiant directed his investigative focus to a device at IP address 136.32.58.184 because it was associated with torrents that contained files of investigative interest to CSAM investigations.

8. Using a computer running investigative BitTorrent software, Affiant directly connected to the device at IP address 136.32.58.184, hereinafter referred to as the "**Suspect Device**." The **Suspect Device** reported that it was using BitTorrent client software Torrent Downloader 1.2 and was sharing torrents that referenced files, which contained CSAM.

9. The torrent had the info hash: d9afcde3461a1ade1c24b91a0686264bbaf78eac and referenced 36 files. On March 16, 2023, between 10:09 p.m. and 10:18 a.m., the Affiant successfully completed the download of 24 files from the torrent that the **Suspect Device** was making available. A video file was labeled with a title indicating that it contained CSAM related

material. The video was sixteen minutes and twenty-four seconds in length, depicting a nude, prepubescent female with an adult male digitally penetrating her anus while rubbing her vagina with his fingers. The adult male then rubs his erect penis against her vagina and anus before penetrating her anus with his penis.

10. On March 17, 2023, March 24, 2023, June 7, 2023, June 11, 2023, and July 12, 2023, Affiant again directed his investigative focus to the **Suspect Device** because it was associated with additional torrents, which were identified as having files of investigative interest to CSAM investigations.

   a. One torrent had the info hash: 49cd35df95b12d8dc8c025293d2ad50c24b8c854 and referenced 35 files. On March 17, 2023, between 4:40 a.m. and 4:57 a.m. the Affiant successfully completed the download of 29 files from the torrent that the **Suspect Device** was making available. A video file was located and labeled with a title indicating CSAM related contents. The video was two minutes and six seconds in length, depicting a nude, prepubescent female with her hands and feet bound while an adult male was enticing a dog to lick the child's exposed vagina by applying butter. The adult male then placed his penis into the child's mouth for oral sex while the dog continued to lick the child's vagina.

   b. A torrent with the info hash: 51d49fa4fafe9f2268dcac0bec1daa6c5d894575 referenced 23 files. On March 24, 2023, between 8:44 p.m. and 10:38 p.m., Affiant successfully completed the download of the 21 files from the torrent that the **Suspect Device** was making available. Inside a folder titled "BabyJ, Affiant located a video labeled, "12 yo girl raped.avi" and was two minutes and one second in length. The video depicted a nude, prepubescent female with her legs bound being anally and vaginally penetrated by an adult male's erect penis.

   c. A torrent with the info hash: 64a33fa034ad1f7b3b9020712a34bf9141811b47 referenced 41 files. On March 24, 2023, between 8:54 p.m. and 9:28 p.m., Affiant successfully completed the download of the 16 video files from the torrent that the **Suspect Device** was making available. One of the video files contained the term "pedofilia" in the title and was three minutes and twenty-three seconds in length. The video depicted a nude, prepubescent female with arms and legs bound while an adult male digitally penetrates her vagina with his fingers then inserts his penis into her mouth. Another video with the terms "3+4Yr" and "sexually abused" in its title depicted two nude toddlers in a bathtub where they take turns masturbating an adult male's erect penis with their hands, perform oral sex on his penis, and continues until he is rubbing his erect penis against one of the child's exposed vagina until he ejaculates onto her genitals. The video was four minutes and thirty-nine seconds in length.

d.  A torrent with the info hash: 9359effcf18b708dbdfaf64c7929b27339b18aa9 and referenced 51 files. On on March 24, 2023, between 9:04 p.m. and 10:15 p.m., Affiant successfully completed the download of 20 files from the torrent that the **Suspect Device** was making available. Inside a folder with the titled "PTHC Open Collection" was a video titled, "F21.mpg" that depicted a nude, prepubescent female with an adult male's penis partially inserted into her exposed vagina, while he masturbated himself. The video was seventeen minutes and eighteen seconds in length.

e.  A torrent with the info hash: dceecff5d2891eed7b18bb0eef585fb3290c7120 and referenced 1 video file. On March 24, 2023, between 10:19 p.m. and 10:32 p.m., Affiant successfully completed the download of the 1 video file from the torrent that the **Suspect Device** was making available. The video had the "Fuck" and "girl" in its title and depicted a nude, prepubescent female with an adult male's erect penis in her mouth, who then proceeded to have vaginal sex with the child. The video was eighteen minutes and eighteen seconds in length.

f.  A torrent had the info hash: 00df6ca51e6803f5cb98df3b5877dec2ecbd042e and referenced 1 video file. On June 7, 2023, between 6:55 p.m. and 8:36 p.m., Affiant successfully completed the download of 1 video file from the torrent that the **Suspect Device** was making available.  The video was one minutes and eighteen seconds in length and depicted a nude male toddler with a masked adult female, who was performing oral sex on the toddler.

g.  A torrent had the info hash: 817e0637dd4bdfdb4bc032408da650391d8fd609 and referenced 2,809 files. On June 11, 2023, between 4:17 p.m. and 5:00 p.m., Affiant successfully completed the download of approximately 1,876 files from the torrent that the **Suspect Device** was making available.  One of the video files contained the term "5yo" and "Cock" in the title and depicted a naked prepubescent male performing oral sex to an adult male's erect penis, before the adult male began having anal sex with the child. Another file folder with "babypics" in the title had multiple images depicting infants and toddlers exposing their genitals and engaged in sexually explicit acts with adults. Most of the videos and images within this torrent were apparent CSAM.

h.  A torrent had the info hash: 7c3a8a8eb928e4e24aba0ffb213cd6a5cb5ea4cc and referenced 60 files. On July 12, 2023, between 6:19 PM and 6:29 PM, Affiant successfully completed the download of approximately 8 files from the torrent that the **Suspect Device** was making available.  One of the video files "000052.avi" depicted two naked prepubescent males, one of which was performing oral sex on the other male's erect penis.  Another video file, "000057.mpg", depicted a naked prepubescent male lying on top of an adult male, whose penis was inserted into the boy's anus.  The child's genitals are exposed.

11. The **Suspect Device** at IP Address 136.32.58.184 was the sole candidate for the downloads referenced above, and, as such, each file was downloaded directly from this IP Address.

12. On June 19, 2023, Affiant conducted a query through MAXMIND, a digital mapping company that provides location data for IP addresses. MAXMIND reported that the **Suspect Device** at IP Address 136.32.58.184 was registered to Google Inc. with a possible geo-location address in or near Lee's Summit, Missouri. An administrative subpoena was served upon Google Inc., for subscriber information

13. On June 30, 2023, Google's response indicated that the subscriber information for IP address 136.32.58.184 was as follows: Rachel Davis, **16111 Slater Ave., Belton, Missouri 64012**. The primary email address was associated with Rachel Davis. The account activation date occurred on November 3, 2022.

14. Open-source database searches revealed Steven M. George, with a date of birth of November 24, 1980, social security number xxx-xx-7777, was also associated with the **SUBJECT PREMISES**. Steven M. George's Missouri Driver's License listed the **SUBJECT PREMISES** as his residence. Publicly accessible records listed Rachel Davis and Steven M. George as the current occupants of the **SUBJECT PREMISES**.

15. Law enforcement databases show in 2009, Steven M. George ("GEORGE") was charged and sentenced in Jackson County (1016-CR02003-01) for Statutory Sodomy-First Degree with the victim being a 4-year-old child. In addition, GEORGE also has two previous convictions for possession of child pornography. GEORGE is required to register as a sex offender in the State of Missouri based on this conviction. A review of the publicly accessible Missouri State Highway Patrol Sex Offender Registry shows that GEORGE lists **SUBJECT PREMISES** as his current residence, last updated on May 9, 2023.

16. On July 4, 2023, Affiant conducted physical surveillance in the vicinity of the **SUBJECT PREMISES** and observed a tan 2004 Honda Accord, bearing Missouri license plate #XE7 J6N, parked in the driveway of the **SUBJECT PREMISES**. This vehicle was registered to Steven M. George, with his residence listed as **16111 Slater Ave., Belton, Missouri**. Another vehicle, a 2016 Lincoln MKX, bearing Missouri personalized license plate #STCHES, was also parked in the driveway of the **SUBJECT PREMISES**. This second vehicle was registered to Rachel Davis, with her residence listed as **16111 Slater Ave., Belton, Missouri**. All visible Wi-Fi Internet networks in the immediate surrounding area of the **SUBJECT PREMISES** showed to be password protected.

17. On July 10, 2023, your Affiant conducted physical surveillance in the vicinity of the **SUBJECT PREMISES** and observed that the 2004 Honda was not located at the **SUBJECT PREMISES**. Affiant then proceeded to the address of 2600 Precision Dr., Harrisonville, Missouri, Universal Forest Products, Inc. ("UFP"). GEORGE listed this address as his employment address on the Missouri State Highway Patrol Sex Offender Registry. Upon arrival, Affiant observed the tan Honda Accord registered to GEORGE parked in the south employee parking lot of the business.

18. On July 11, 2023, Affiant conducted physical surveillance in the vicinity of the **SUBJECT PREMISES** and observed the white Lincoln and the tan Honda to be parked in the driveway. Affiant drove by the residence and observed GEORGE and Rachel Davis outside the residence with the garage door open.

19. On July 12, 2023, Affiant sent an email to the United States Postal Inspector, for the Kansas City Domicile, requesting information regarding packages that had been sent to the address of **16111 Slater Ave., Belton, Missouri, 64012**. The Postal Inspector responded that no packages had been imaged for the listed address; however, in October of 2022, Steven M. George

7

had submitted a change of address to the Post Office for his move to the 16111 Slater Ave., Belton, Missouri address.

20. On July 12, 2023, Affiant contacted and sent the UFP Industries, Inc. Director of Employment Practices, an email requesting Steven M. George's work schedule and verification of his phone number. She responded with his work schedule and stated that he had two phone numbers on file, 816-XXX-9489 and 816-XXX-1927.

21. In Affiant's experience, multiple occupants of a single residence tend to share access to Internet connections, in particular Wi-Fi connections, thus making it possible that any Internet capable device located within the **Subject Premises** could have been the **Suspect Device** in this case.

## DEFINITIONS

22. The following definitions apply to this Affidavit and to **Attachment A** to this Affidavit:

   a. "Child Erotica," as used herein, means materials demonstrating a sexual interest in minors, including fantasy narratives, cartoons, and books describing or alluding to sexual activity with minors, sexual aids, children's clothing catalogues, and child modeling images.

   b. Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

   c. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes

smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

d. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

f. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

g. "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

i. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.

9

ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

k. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

l. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

m. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

n. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

o. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

p. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

q. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

r.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

s.  A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

t.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

**BACKGROUND ON COMPUTERS, CELL PHONES, AND CHILD PORNOGRAPHY**

23. Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

24. The development of computers has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

25. With the advent of digital cameras and cell phones, images can now be transferred directly from a smart phone onto a computer. Images can also be also be transferred from a computer to a smart phone. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

26. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

27. A smartphone, or smart phone, is a mobile phone with more advanced computing capability and connectivity than basic feature phones. Early smartphones typically combined the features of a mobile phone with those of another popular consumer device, such as a personal digital assistant (PDA), a media player, a digital camera, or a GPS navigation unit. Modern smartphones include all those features plus the features of a touchscreen computer, including web browsing, Wi-Fi capability, and apps. Frequently, smartphones also include removable storage devices, or SD cards, where users can store data, including picture and video files.

28. Smart phone technology has expanded computer capability in recent years by allowing users to access the Internet via their phone. The smart phone user can search the Internet for specific files, check personal email accounts, log on to social networking sites, communicate

with other computer users, compose and edit documents, and store and view movie and picture files.

29. The Internet and its World Wide Web afford collectors of child pornography several different venues and social media platforms for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

30. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as cloud storage, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.

31. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data. Even when users delete data, remnants or evidence of that data may still remain within the computer data.

13

32. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

**TECHNICAL INFORMATION REGARDING P2P SOFTWARE AND BITTORRENT**

33. Peer to Peer (P2P) file sharing allows people using P2P software to download and share files with other P2P users using the same or compatible P2P software. P2P software is readily available on the Internet and is often free to download. Internet connected devices such as computers, tablets and smartphones running P2P software form a P2P network that allow users on the network to share digital files. BitTorrent is one of many P2P networks. For a user to become part of the BitTorrent network, the user must first obtain BitTorrent software and install it on a device. When the BitTorrent software is running and the device is connected to the Internet, the user will be able to download files from other users on the network and share files from their device with other BitTorrent users.

34. Users of the BitTorrent network wishing to share new content will use a BitTorrent program to create a "torrent" file for the file or group of files they wish to share. A torrent file is a small file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on Internet sites that host or link to them. Torrent files may be referenced by their "info hash", which uniquely identifies the torrent based on the file(s) associated with the torrent file.

35. To download file(s) from other users on the BitTorrent network, a user typically obtains a torrent file. The BitTorrent software processes the information in the torrent file and

locates devices on the BitTorrent network sharing all or parts or the actual file(s) being sought. The download of the content referenced in the torrent is achieved after the requesting computer and the sharing computer(s) directly connect to each other through the Internet using the BitTorrent software.

36. Third party software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses. Such Software monitors and logs Internet and local network traffic.

**SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

37. Searches and seizures of evidence from cellular phones commonly require agents to download or copy information from the cellular phone to be processed later in a laboratory or other controlled environment. This is almost always true because of the following:

   a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

38. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child

pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software that may have been used to create the data (whether stored on hard drives or on external media).

## SEARCH METHODOLOGY TO BE EMPLOYED

39. The search procedure of electronic data contained in computer hardware, computer software, memory storage devices, and/or cell phones may include the following techniques (the following is a nonexclusive list, as other search procedures may be used):

   a. examination of all of the data contained in such computer hardware, computer software, memory storage devices, and/or cell phone to view the data and determine whether that data falls within the items to be seized as set forth herein;

   b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

   c. surveying various file directories and the individual files they contain;

   d. opening files in order to determine their contents;

   e. scanning storage areas;

   f. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in **Attachment B**; and/or

   g. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in **Attachment B**.

## CHARACTERISTICS COMMON TO INDIVIDUALS INVOLVED IN THE DISTRIBUTION, RECEIPT, OR POSSESSION OF CHILD PORNOGRAPHY OR IN ATTEMPTS TO COMMIT THOSE CRIMES

40. As set forth above, probable cause exists to believe that one or more individuals residing at the **SUBJECT PREMISES** has distributed, received or possessed child pornography, or has conspired or attempted to commit these crimes. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

   a. Those who distribute, receive or possess child pornography, or who conspire or attempt to commit these crimes may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

   b. Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

   c. Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes often possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, videotapes, magazines, negatives, photographs, correspondences, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. **These individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.**

   d. Likewise, those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. **These collections are often maintained for several years and are kept close by, usually on their property including**

17

      **external garages and outbuildings, to enable the collector easier access to view the collection, which is valued highly.**

    e.    Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individual with whom they have been in contact and who share the same interests in child pornography.

    f.    **Those who distribute, receive or possess child pornography, or who attempt or conspire to commit these crimes prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.**

## CONCLUSION

41.    Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that one or more individuals who reside at the **SUBJECT PREMISES**, more fully described in **Attachment A**, is involved in the distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252 (a)(2) and (a)(4). Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of 18 U.S.C. §§ 2252 (a)(2) and (a)(4) (distribution, receipt, and possession of child pornography), is located in the residence described above (the **SUBJECT PREMISES**), and this evidence, listed in **Attachment B** to this affidavit, is contraband or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

42. Your Affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the **SUBJECT PREMISES** described in **Attachment A** and seizure and search of the items listed in **Attachment B**.

**FURTHER AFFIANT SAYETH NOT.**

Jamie Frates
Task Force Officer
Federal Bureau of Investigation

Sworn and subscribed to me by telephone on this 21st day of July 2023.  Sworn to by telephone
11:43 AM, Jul 21, 2023

HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri



19